In accordance with the Court of Appeals Opinion filed November 21, 1995, the undersigned have reviewed the record with respect to causation and, in particular, with respect to the standard for identifying occupational diseases set out in Rutledge v. Cultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983).
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing as:
STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Subsequent to the hearing, the parties stipulated that plaintiff's average weekly wage is $502.00 yielding a compensation rate of $334.68.
* * * * * * * * * * *
In accordance with the Court of Appeals Opinion and the evidence in the record, the Full Commission finds as follows:
FINDINGS OF FACT
1. As of December 1990, plaintiff had been employed by defendant's police department for over sixteen years. His position since 1981 was detective sergeant, and his job duties included working as the lead investigator in all of the major crimes which occurred in the city. He was an excellent criminal investigator and diligent in his work.
2. Plaintiff had a history of problems with depression and anxiety traceable to his early life. He had sought treatment for such symptoms during at least two difficult periods in his adult life when there were serious problems within his family. The most recent episode where he had sought treatment had been in the early 1980's. He subsequently had further family difficulties in 1987 or 1988 when he had to order one of his sons out of his house after finding evidence that the son was using drugs. However, he was not hospitalized or treated for depression at that time.
3. In August 1986 he began to investigate the murder of Roy Gilmore. The case was unusually difficult for him because the death arose from an injection of an overdose of insulin, which was quite different from the normal case and which required him to delve into complicated medical information which was difficult for him to comprehend. Consequently, he felt that the case was over his head. Mr. Gilmore's son and wife were the suspects and were ultimately arrested for the crime. Before the arrests were made, however, the son made threats to plaintiff's life and even offered someone $10,000.00 to kill plaintiff. Under the circumstances, plaintiff took the threats seriously, so there was additional stress associated with the case.
4. Mr. Gilmore's son was ultimately convicted of murder. The wife was tried twice, in March and in October 1989, and in both cases a mistrial was declared. Plaintiff could not recall losing a case and was quite distraught. Plaintiff was responsible for interviewing, scheduling and calling the witnesses for the prosecutor as well as for testifying in the case. By the time of the second trial, he was having apparent trouble concentrating and was complaining of headaches and chest pain. He behaved strangely, locking himself in his office and in his room at home with the lights out for long periods of time in order to be alone.
5. Plaintiff was evaluated by a cardiologist in the summer of 1989 and was followed by Dr. Clemens for complaints of chest pain and headaches. He had high blood pressure and was a heavy smoker. Dr. Clemens advised him to stop smoking and prescribed Xanax to help him with any anxiety he developed from stopping smoking. Plaintiff returned to Dr. Clemens on October 10th complaining of being under stress due to the Gilmore trial. Dr. Clemens thought that he was having an anxiety attack and prescribed more Xanax.
6. After the trial was over, plaintiff attempted to relax and go to the beach on vacation. However, he was called back to Sanford early because a police officer's wife had been killed. He supervised the investigation of her death but could not get directly involved because he did not think he could handle the investigation well. In addition, his supervisor had observed that he was moody, irritable and acting strangely, although at this time he was still apparently somehow managing to perform his job despite his misgivings.
7. When plaintiff saw Dr. Clemens in November 1989, his anxiety was better but he requested an appointment be made after Christmas with a psychologist. Dr. Clemens made an appointment for him, but it is not known whether he actually went to the psychologist for therapy.
8. In approximately January 1990, plaintiff seriously contemplated suicide. In fact, his wife came into the room and found him with a gun to his head. After a long talk, she told him that she wanted him to quit his job. He told her that, although the job was getting to him, he loved his work and had a lot invested in it. He did not want to quit. This strong dedication contributed to plaintiff's stress level.
9. During that month plaintiff was treated at the hospital for peptic ulcer disease, but there is no evidence that he received treatment for anxiety or depression although he continued the medication previously prescribed. When he saw Dr. Clemens on February 15, 1990, Dr. Clemens noted that his anxiety and depression were stable, although he did not elaborate on the meaning of "stable", and that the Tagamet he was taking for his stomach problems had helped considerably. He was continuing to work for the police department and had not missed any time from work due to his psychological condition up until that time, although he was still affected by the work-related stress and the previous trials.
10. On February 18, 1990, plaintiff's mother called him from Myrtle Beach and told him that his brother, who lived with her and who had left the day before, had not returned home as expected. Consequently, he drove to Myrtle Beach to try to find his brother. He found evidence that his brother had been out on his sailboat, so he called the local police who searched and found the body in the water. Plaintiff believed that his brother had been murdered and asked for a criminal investigation, but the Myrtle Beach Police Department refused to investigate and concluded that the death was accidental. He became quite angry and agitated, and tried to get friends to intervene with the police department in Myrtle Beach.
11. Plaintiff's brother had been a father figure for him and the brother's death, combined with the suspicious circumstances surrounding his disappearance and the refusal of the police to investigate, was devastating to plaintiff. He saw Dr. Clemens on March 6, 1990 and reported that he was on the verge of a nervous breakdown. Dr. Clemens admitted him to the hospital. He was later admitted to Holly Hill Hospital for treatment of severe depression and remained there for approximately two months. Several weeks after his discharge, he was readmitted and then transferred to Cumberland Hospital for further inpatient treatment. Dr. Cusi treated him while he was there and after his discharge until February 1991. At that time Dr. Cusi recommended further inpatient treatment.
12. As of October 1989 plaintiff was experiencing symptoms of anxiety and depression which were related in significant part to the stress associated with his job with defendant. He was placed at an increased risk of developing depression by virtue of his job duties as a detective with defendant's police department.
13. Following his brother's death on February 17, 1990, plaintiff developed severe, disabling depression which required inpatient treatment. Although the death of his brother was an aggravating factor in plaintiff's disabling depression or the "straw that broke the camel's back", it was not an intervening event unrelated to his employment thereby breaking the chain of causation. In fact, the effect of plaintiff's brother's death impacted the end of a process that had begun earlier as a result of work-related stress.
14. Plaintiff's exposure to work-related stress was such a significant contributing factor in the development of his severe depression that without it his depression would not have developed to such an extent that it caused the disability resulting in plaintiff's incapacity for work. Consequently, the disability which plaintiff suffers is a result of a stress-related occupational disease.
15. Beginning February 23, 1990, plaintiff was unable to earn any wages in any employment as a result of his occupational disease.
* * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As of October 1989 plaintiff developed work-related anxiety and depression, an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. Although plaintiff's brother's death was a factor in plaintiff's depression, it was not an intervening event. Plaintiff became totally disabled as a result of his work-related occupational disease beginning February 23, 1990. N.C. Gen. Stat. § 97-29 and § 97-53 (13).
2. Plaintiff is entitled to compensation subject to an attorney's fee for total disability at the compensation rate of $334.68 beginning February 23, 1990 and continuing until plaintiff returns to work, sustains a change of condition or further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendant provide all medical treatment related to plaintiff's occupational disease, including future treatment, to the extent such treatment tends to effect a cure, give needed relief or lessen his period of disability. N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Defendant shall pay compensation to plaintiff at the rate of $334.68 per week for his temporary total disability from February 23, 1990 and continuing until such time as plaintiff returns to work, experiences a change of condition, or further Order of the Commission. Such compensation which has accrued shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of this occupational disease when bills for the same have been submitted in accordance with approved Industrial Commission procedure.
3. A reasonable attorney's fee is hereby approved for plaintiff's attorney in the amount of 33 1/3 percent of the compensation recovered by plaintiff, which fee shall be deducted from the amount which has accrued. Thereafter, an attorney's fee shall be paid in the amount of 33 1/3 percent of the benefits payable by agreement of the parties.
4. Defendants shall pay the costs, including an expert witness fee, to the extent such fees have not already been paid, in the amount of $300.00 to Dr. Cusi and $650.00 to Dr. Clemens.
 S/ ________________________ C. SELLERS COMMISSIONER
CONCURRING:
S/ ________________________ THOMAS J. BOLCH COMMISSIONER
S/ ________________________ MORGAN S. CHAPMAN DEPUTY COMMISSIONER